IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ANDREW THOMAS PAYNE,

                      Plaintiff,                      OPINION AND ORDER

v.

                                                 18-cv-526-wmc

ANDREW M. SAUL, Commissioner of
Social Security,

                      Defendant.

Pursuant to 42 U.S.C. § 405(g), plaintiff Andrew Thomas Payne seeks judicial review of a final determination that he was not disabled within the meaning of the Social Security Act. Payne contends that remand is warranted because the administrative law judge ("ALJ") erred in assessing his credibility. The court held a telephonic hearing on plaintiff's appeal on November 15, 2019. Because the the ALJ built a logical bridge between the evidence and her discounting of Payne's testimony of his limitations, the court will affirm the denial of benefits.

BACKGROUND[1]

**A. Overview of Claim**

Plaintiff Andrew Payne applied for social security disability benefits and supplemental social security income on March 30, 2015, originally claiming an alleged onset date of March 23, 2015. However, on March 2, 2017, almost two years later, Payne amended his claimed onset date to April 29, 2013, more than two years earlier. (AR 267.)

---

[1] The following facts are drawn from the administrative record, which can be found at dkt. #6.

Regardless, with a birth date of July 16, 1977, Payne was "a younger individual" on both his original and amended onset dates. Payne has past relevant work as tow truck driver, construction worker and auto technician. He claimed disability based on degenerative disk disease. (AR 225.)

B. ALJ's Decision

ALJ Diane S. Davis held a video hearing on April 12, 2017, at which Payne appeared personally and by counsel. As of the alleged onset date, the ALJ found that Payne suffered from the following severe impairment: "degenerative disc disease status post cervical fusion." (AR 18.)[2] Even with his severe impairment, the ALJ determined that Payne has the residual functional capacity ("RFC") to perform "light work" with the following, additional restrictions: "he can never climb ladders, ropes, and scaffolds; can never perform commercial driving; and he can only occasionally perform overhead work." (AR 19.)

In crafting the RFC, the ALJ acknowledged Payne's testimony that he "could only drive for up to 15 minutes at a time"; "spent most of a typical day sitting in a reclining chair"; "frequently lost circulation in his arms and they became weak when he extended above his waist or above his head"; was "unable to tilt his head up or down"; and claimed that "he had headaches 'pretty well constant.'" (AR 19.) However, the ALJ discounted this testimony, finding them inconsistent with the medical evidence and other record evidence. As for the former, the ALJ relied on medical evidence from 2013, in which Payne's physical examination showed "no acute distress, with normal neck range of motion,

---

[2] In so finding, the ALJ also noted a *possible* carpal tunnel syndrome diagnosis in the medical records, but found that it was either not diagnosed or not severe. Payne does not take issue with this finding.

2

normal strength and sensation in the extremities and normal posture." (AR 20.) The ALJ also noted that his April 15, 2013, x-ray only showed "'mild' disc space narrowing at C5-C6," although the ALJ subsequently noted the MRI study that same month showing "multilevel degenerative disc disease." (AR 20.) The ALJ also pointed to Payne's epidural steroid injections, the first of which offered improvement. In addition, the ALJ cited numerous references in the medical records of Payne continuing to work, albeit on a much reduced schedule, well after his alleged amended onset date and even into late 2014. Next, the ALJ pointed out the gap in medical treatment between October 2013 and February 2015. She also pointed to the March 2015 MRI, which showed "no significant change from previous studies." (AR 21.)

Post-surgery, the ALJ further relied on medical notes describing the surgery as successful, as well as the fact that Payne's surgeon released him from care in June 2015 and that Payne sought no further treatment until May 2016. At that time, Payne reported that he had "done well since surgery," but recently experienced neck pain again. Even then, Payne's next scheduled appointment was not until April 5, 2017, when he reported neck pain and headaches.

As for other evidence, the ALJ relied on Payne's testimony to being "able to care for his autistic son, and . . . able to travel with his family, including [his] non-verbal, autistic son, over a two-week time period to the Philippines in 2016." (AR 21-22.) The ALJ also placed little weight on the opinions of the state agency medical consultants, since both doctors reviewed Payne's medical record in mid-2015, following his surgery, and found that Payne was not disabled because his symptoms should resolve within 12 months. (AR

3

70 (Dr. Khorshidi's May 4, 2015, report); AR 87-88 (Dr. Foster's June 25, 2015, report).)

Ultimately, the ALJ concluded on the record before her that Payne could not perform any past relevant work, finding those jobs were at least medium exertion level jobs. Relying on the expert testimony of the vocation expert, however, the ALJ determined that Payne could perform light, unskilled work that could accommodate his additional, exertional restrictions, including mailroom clerk, cashier and counter clerk jobs.

## C. Medical Record

For ease of discussion, the court divides Payne's relevant medical records into three phases: (1) initial complaints of pain and numbness in 2013; (2) follow-up appointments and surgery in 2015; and (3) subsequent complaints of pain and headaches in 2016 and 2017.

### 1. 2013

On March 15, 2013, Payne saw Erin L. Maslowski, M.D., with the Neuroscience La Crosse clinic, for a consultative examination at the request of Payne's treating physician Patricia Swasko. At that point, Payne complained of pain and tingling in his shoulders and arms for approximately the past two months. After reviewing his record, including references to thoracic outlet surgery in 2004 and 2005, Maslowski conducted a physical exam and recommended physical therapy. She also suggested Payne recheck with a PA-C in her office in 4 weeks. (AR 323-24.)

On April 15, 2013, Payne did just that, seeing Corinne L. Weiss, PA-C for shoulder and arm pain. He agreed to start taking gabapentin and restart physical therapy. Weiss

4

also ordered an x-ray and MRI. The x-ray of Payne's cervical spine taken that day revealed "abnormal kyphosis" and "mild disk space narrowing at C5-C6." (AR 315; AR 347 (X-ray results).) An MRI dated April 29, 2013, showed "multilevel degenerative disk changes resulting in some degree of canal and foraminal stenosis at multiple levels," and "broad-based disk osteophyte complex lateralizing to the right at the C5-6 level causing moderate to severe bilateral foraminal stenosis impinging the right C7 nerve root." (*Id.*; AR 345-46 (MRI results).)

Payne reviewed these results with PA-C Weis on April 29 and agreed to continue physical therapy. (AR 320.) Payne also agreed to try a cervical epidural injection, which he did on May 6, 2013. (AR 319.)

On May 17, 2013, Payne again saw Dr. Maslowski about his neck and bilateral arm pain. Dr. Maslowski confirmed that his MRI "corresponds with his symptoms." (AR 318.) However, Payne reported that "he is working too much to allow time for recovery," prompting Maslowski to note his difficult situation in owning an auto shop. (AR 319.) Payne indicated that he was open to another cervical injection. While Maslowski agreed to that treatment, she also thought surgery would be Payne's best option, but noted, "[u]nderstandably he is reluctant to pursue that." (*Id.*) Maslowski then referred him for another injection and agreed to see him again in two to three weeks.

After undergoing another cervical epidural injections, Payne saw Dr. Maslowski for a follow-up appointment on June 17, 2013, but reported that the second injection increased his pain and that he had canceled his most recent physical therapy session after a severe exacerbation of his pain due to a difficult work day on June 6, 2013. (AR 315-

17.) At that point, Dr. Maslowski recommended that Payne see a surgeon, Dr. Davis, to consider cervical disc surgery. (AR 316.) She also prescribed him prednisone.

On July 16, 2013, Payne saw Jerry Davis, M.D., for "neck pain causing headaches and bilateral arm pain" lasting for over five months. (AR 314.) Payne also reported trying steroid injections without improvement, to the point that he "now restricts himself to only 2 hours working a day, and even within those 2 hours, the neck pain and headaches are disabling to him." (AR 314.) Dr. Davis further noted that Payne's X-rays and CT scans show: "significant degenerative disease in his cervical spine, with an S-shaped loss of lordosis." (*Id*.) "In terms of his arm pain," Davis also noted "foraminal stenosis at 5-6 and 6-7." (*Id.*) As a result, Davis discussed Payne's surgical options, including a 4-level anterior cervical discectomy to address both neck and arm pain, but made no recommendation, indicating, instead that Payne should consider his options.

On September 11, 2013, Payne saw Michael Ebersold, M.D., for a second opinion about his shoulder and arm pain and numbness in hands. Dr. Ebersold noted the MRI results showing degenerative changes in the cervical spine. (AR 314.) However, on exam, Ebersold noted "normal strength" in his arms, and no "apparent atrophy" of the hands. (*Id*.) Ebersold also stated, "[w]ith extension of the neck which one would think would cause radicular symptoms secondary to foraminal narrowing, he does not have any obvious radicular symptoms." (*Id.*) After reviewing Dr. Davis's note, Ebersold indicated that he would not be inclined to recommend surgery. Dr. Ebersold also suggested that Payne may be suffering from carpal tunnel syndrome and ordered an EMG.

6

## 2. 2015

At this point, there is a significant, 18-month gap in Payne's medical records. On February 26, 2015, Payne returned to the Neuroscience clinic for an appointment with Jane Mitley, APNP. After reporting that his symptoms had become worse, and that he was experiencing neck pain with numbness of his arms and hands, Payne described his pain as constant and rated his greatest pain at 10/10 and least pain as 3/10. (AR 311-12.) In response, Mitley ordered an MRI and a CT of his cervical spine.

On March 4, Payne again met with Dr. Davis to discuss surgery. In his notes, Dr. Davis wrote that Payne "continued to have neck and bilateral arm symptoms" and is "now unable to work because of the symptoms." (AR 311.) Dr. Davis also noted that Payne "held a job until about 3 months ago, but ultimately had to stop[] because of the pain in his neck and shoulders." (AR 311.) Davis further summarized the result of Payne's most recent MRI, stating:

> MRI of his cervical spine shows some no [sic] significant change from previous studies, but does show severe and advanced degenerative disease from the C3-4 disk to the C6-7 disk. He has reversal of his lordotic curve of his cervical spine, severe disk degeneration, and end plate changes within the vertebral bodies. He has foraminal stenosis at multiple levels.

(AR 311; AR 340-41 (MRI results).) Davis also explained that Payne "has tried to tolerate his symptoms as best he can without any intervention," but "being unable to work has pushed him towards needing surgery." (*Id.*) On March 19, 2015, Payne met with Davis to discuss scheduling surgery.

On March 23, 2015, Payne underwent a C3-4, C4-5, C5-6, C6-7 anterior cervical discectomy and fusion with C3-C7 posterior fusion, performed by Dr. Davis. (AR 285-

91.) After the surgery, Payne was transferred to the ICU where he remained intubated and sedated until the following day. After a five-day hospital stay, Payne was discharged on March 28, 2015.

A March 27, 2015, x-ray of his cervical spine showed "postsurgical changes of posterior, anterior, and interbody fusion of C3-C7. Marked improvement of alignment." (AR 336.) On April 10, 2015, Payne also saw Linda A. Schoen, R.N., for his two-week post-op incision check. Nurse Schoen noted that he was being seen per Dr. Davis's direction and that she was under the supervision of an APNP. In her notes, Schoen indicates that: Payne "is pleased to report the pain in his shoulders, arms and hands is gone. He has not noted any numbness or tingling in his arms and hands since surgery," and that he rated his neck pain as 2 out of 10, but described it more as "pressure, surgical type pain." (AR 282.) Payne also indicated that by then he is was taking no pain medication, though he did use Lidoderm patches the first couple of days after discharge. Nurse Schoen then examined the incision, removed the staples without incident, and advised Payne that he could resume his normal routine, but that until his surgeon stated otherwise, he should not lift more than 10 pounds, lift or work over his head, hold him arms above shoulder level, forcefully push or pull, bear weight on his head, or across his neck and shoulders, or do handwork with repeat motions. (AR 282.)

On June 2, 2015, Payne saw Dr. Davis again, who noted that: Payne "does continue to have stiffness and soreness in his neck and these symptoms limit his activities," but he "is better than 10 weeks removed from his surgery and he can resume all activities his body will tolerate. Again however, his ongoing pain and stiffness in his neck and shoulder will

8

provide the long-term restriction of activities." (AR 357.) Dr. Davis discharged Payne from the clinic.

### 3. 2016-2017

Approximately a year later, on May 5, 2016, Payne was next seen by Matthew K. Zimmerman, PA-C, for concerns of neck pain. Zimmerman noted that Payne "[h]as done well since surgery, until approximately 4-5 days ago, when he started having right-sided neck pain that radiated up into his head." (AR 361.) Payne also acknowledged his "pain is a bit better today," and while he has "decreased range of motion, [] he is happy with his surgery." (*Id.*) Zimmerman ordered an x-ray, which showed "no issues with his surgical site." (*Id.*)

Some eleven months after that encounter, Payne saw Patricia A. Swasko, APNP, on April 5, 2017, complaining of "chronic neck, shoulder, and upper back pain with headaches since 3/2015 since undergoing" surgery. (AR 365.) Payne described his pain as always present and "3 to 10 out of 10." Payne also reported that he was unable to concentrate due to the pain, that he tried Gabapentin and Vicodin before the surgery, but that medication did not improve his pain and made him feel weird. Payne further reported that he had to move every 15 minutes and that he does not tolerate car rides. Swasko referred him to PT and occupational health and told him to return if his symptoms continued. This appointment was one week before the April 12 hearing before ALJ Davis.

OPINION

The standard by which a federal court reviews a final decision by the Commissioner

of Social Security is well-settled. Findings of fact are "conclusive," so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Accordingly, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993). At the same time, the court must conduct a "critical review of the evidence," *id.*, and insure the ALJ has provided "a logical bridge" between findings of fact and conclusions of law, *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

Here, Payne challenges the ALJ's credibility determinations, particularly the ALJ's refusal to credit Payne's testimony "that he needed to take unscheduled breaks during the day and sit [in] a recliner to support his head." (Pl.'s Opening Br. (dkt. #9) 10 (citing AR 54).) If the ALJ had credited this testimony in particular, plaintiff correctly reasons that he would have been found disabled, citing the vocational expert's response to a hypothetical question conceding as much. (*Id.* (citing AR 60).)

The law is clear that credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying, while a reviewing court obviously does not. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Thus,

courts give an ALJ's credibility determinations a "commonsensical reading," rather than "nitpick the ALJ's opinion for inconsistencies and contradictions," *id.*, and will overturn an ALJ's credibility finding only if "patently wrong." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).

Plaintiff points to several statements in the ALJ's opinion, which he complains rest on flawed reasoning. First, plaintiff faults the ALJ's reference to plaintiff's statement that he could only walk 30 feet at a time because it was made in a function report completed on April 27, 2015, within a month of his surgery (AR 236), reasoning that plaintiff's ability to walk at that time was likely still being impacted by the surgery. However, there is nothing to indicate that the ALJ did not appreciate the timing of this self-report. Moreover, some three weeks before Payne made this statement, he had informed Nurse Schoen in a postop incision check that his pain and numbness or tingling in his arms and hands had already resolved, and that he rated his neck pain, which he described as more "pressure, surgical type pain," as just 2 out of 10. (AR 282.) In other words, even properly placing this statement on Payne's treatment timeline, there is evidence in the record to support a finding that he exaggerated his limitations after surgery. More critically, the record reflects that by June 2015, he was released from his neurosurgeon's care, and except for two, brief medical visits -- the first, a year from his last neurosurgery appointment and the second almost another full year after that -- there is no medical evidence of continued pain.

Second, plaintiff also faults the ALJ for her treatment of the records from these two medical visits, arguing that the ALJ engaged in cherry-picking by noting that neither doctor "observed any difficulty using the hands or sensory defects." (Pl.'s Opening Br. (dkt. #9)

11

11 (citing AR 21).) After his release from care by his neurosurgeon in June 2015, however, there are no medical records that contradict the ALJ's description. A cherry-picking argument necessarily involves evidence that the ALJ failed to acknowledge.

Third, plaintiff faults the ALJ for relying on the fact that Payne continued to work on a part-time basis through 2014. In support of this argument, plaintiff points out that Payne testified that he closed his shop in 2013, and the record shows *no* reported earnings in 2014. As Payne was forced to acknowledge during the hearing, however, the record also reflects that he did not close his shop until July 2013, three months after his reported alleged onset date, and further reflects that Payne informed his medical care providers that he was still working, perhaps on a more limited basis, *through* 2014. (AR 311 (reporting to Dr. Davis in March 2015 that he had held a job until about three months ago); AR 314 (reporting in July 2013 that he was still working about two hours per day); AR 311 (noting that Payne was working too much to work on his recovery in May 2013).)[3] The ALJ reasonably relied on these notes in the medical record to find that Payne was able to work at least some of the time through 2014, as well as discount his claim that he spent his days in a recliner.

Fourth, plaintiff faults the ALJ for pointing out that Payne testified that he cared for his autistic child and that he took a two-week trip to the Philippines with his family in

---

[3] At oral argument, counsel for plaintiff suggested that Dr. Davis's note in March 2015 that Payne had stopped working three *months* before, in other words, the end of December, may have been in typo, pointing to another record from later that month in which Dr. Davis referenced three *years*. In the cited page of the record, however, Davis noted that Payne's neck pain started three years ago, *not* that he stopped working three years prior. (AR 283.) There is no dispute that Payne was working -- indeed, still owned his auto shop -- in March 2012, three years before Dr. Davis's March 19, 2015 note.

2016. While the court agrees that these activities do not equate to ability to sustain competitive employment, *see, e.g.*, *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014), there is nothing in the ALJ's decision suggesting that she made this improper leap. Instead, the ALJ also considered this evidence in assessing the credibility of Payne's testimony that he spent most of his time in a recliner since his alleged onset date of April 2013.

Fifth and finally, plaintiff claims that the ALJ erred in relying on the gap in treatment from October 2013 to February 2015, then again from June 2015 through May 2016, and yet again from May 2016 to April 2017. The ALJ reasoned,

> [t]hese multiple long spans of time, including one lasting well over a year, certainly stand in strong odds with the extraordinary level of difficulty he claims to have had performing his regular activities of daily living, and would tend to suggest that he himself did not believe his symptoms were so severe as to warrant any treatment during these periods.

(AR 22.) Plaintiff faults the ALJ for failing to explore why there were gaps in treatment. To her credit, however, the ALJ *did* ask plaintiff about his gaps in treatment, providing him with an opening to offer an explanation, which could have countered the ALJ's conclusion that his symptoms were not as serious as he claimed. (AR 41-44.)

In her decision, the ALJ also acknowledged that it was *possible* that plaintiff did not seek treatment because of cost concerns and a lack of evidence. (AR 22.) However, Payne's only reference to insurance was that his insurance company refused to cover a functional capacity test, and there is *no* indication that he ever lacked coverage for medical treatment altogether, which might explain these long gaps in seeking treatment. The ALJ further recognized that Payne had testified that neither epidural injections nor medication provided him relief. Still, physical therapy, acupuncture and other conservative avenues

13

of treatment *were* suggested, and Payne opted not to pursue them without explanation. In light of Payne's claimed extreme physical limitations during these periods, therefore, the ALJ could reasonably point to these unexplained, significant gaps in medical care as reason to discount his credibility. *See Summers v. Colvin*, 634 F. App'x 590, 592 (7th Cir. 2016) ("An ALJ must inquire into the claimant's reasons before relying on the absence of medical treatment to support an adverse credibility finding.") (citing *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008).[4]

ORDER

IT IS ORDERED that:

1) The decision of defendant Andrew M. Saul, Commissioner of Social Security, denying plaintiff Andrew Thomas Payne's application for disability benefits is AFFIRMED.

2) The clerk of court is directed to enter judgment for defendant.

Entered this 18th day of November, 2019.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge

---

[4] Plaintiff also cites to cases dealing with claimants who have no "determinable basis for pain of that intensity" or "objective medical evidence" (Pl.'s Opening Br. (dkt. #9) 16), but that is not the case here. There is no dispute that plaintiff suffered from degenerative disk disease and underwent a significant cervical surgery in March 2015 to address this disorder.